**Howard SHORETTE and Michael York**

v.

**STATE of Maine and Richard M. Oliver, Warden, Maine State Prison.**

Supreme Judicial Court of Maine.

June 7, 1979.

---

Solman, Page & Hunter by Robert H. Page, Caribou (orally), for plaintiffs.

Michael D. Seitzinger (orally), Charles K. Leadbetter, Asst. Attys. Gen., Augusta, for defendants.

Before McKUSICK, C. J., POMEROY, DELAHANTY, GODFREY and NICHOLS, JJ., and DUFRESNE, A. R. J.

DUFRESNE, Active Retired Justice.[1]

The State appeals, pursuant to 14 M.R. S.A. § 5508 and Rule 35(b)(6), M.R.Crim.P., from the judgment entered in the respective post-conviction habeas corpus proceedings brought by the petitioners-appellees, Howard Shorette and Michael York, in the Superior Court (Aroostook County) following an adjudication on November 10, 1978 by a single Justice of the Supreme Judicial Court as follows:

> "The guilty pleas entered by the petitioners are deemed to be void and the same are ORDERED stricken from the record. Petitioners are ORDERED returned forthwith to the Superior Court, there to be arraigned again on the indict-ments charging each with the crime of terrorizing."

For reasons to be explained in the course of this opinion, we deny the State's appeals.

### I

Prior to reaching the merits of these appeals, we must confront a jurisdictional point in the case of Petitioner Shorette. The State's contention in the Superior Court respecting the matter of jurisdiction was confined to the argument that, even though the verification appended to Shorette's complaint seeking post-conviction habeas corpus relief tracked exactly the terminology suggested in Form 26 of the Appendix of Forms expressly declared by Rule 58, M.R.Crim.P. to be a sufficient verification format required by Rule 35(b)(3) relating to such proceedings, the conjoined petition and verification did not show that Shorette, the signatory of both the petition and verification, was administered the oath by, or made an affirmation before, a person duly authorized to administer oaths. It is true that no jurat was affixed to the verification as contemplated by Form 26 to which we have already referred.

On the other hand, in addition to the petition for habeas corpus relief dated May 25, 1978 and the undated verification, Shorette filed with the Superior Court a motion for appointment of counsel for reasons of indigency accompanied by an affidavit in support of his motion, both being properly signed by him and dated of even date with the original petition. This affidavit in pertinent part reads as follows:

> "*Howard Shorette* being first duly sworn deposes and says:
> 1. I am the *Petitioner* in the above titled *action.*
> 2. I believe I am entitled to the relief sought therein.
> 3. I have read and *know the contents of the petition* and *believe the same to be true.*
> 4. I have no assets of any type and no income of any type.

---

1. Sitting by assignment.

5. Because of my poverty I am unable to retain private counsel or give security therefor.

Dated: May 25th, 1978.

s/ Howard Shorette

Howard Shorette, Petitioner Pro Se

Subscribed and sworn to before me this 25th day of May, 1978.

· s/ Arthur T. Kiskila

Notary Public

My Commission

Expires Mar. 20/80"

(Emphasis added)

The State's attack on the Court's jurisdiction over the habeas corpus proceeding was based on the fact that the verification of the petition, as distinguished from the affidavit in support of the motion for appointment of counsel, was undated and could have been executed prior to, and in connection with a petition other than, the present petition, and, therefore, could not be considered a proper verification of the petition, even in conjunction with the jurat accompanying the affidavit.

We are not impressed with the State's argument. All these separate pleadings (the petition, verification, motion for appointment of counsel and the affidavit in support thereof) clearly demonstrate by internal reference that they form parts of one single procedural package looking towards habeas corpus relief in connection with a previous judgment of conviction for the crime of terrorizing. Nevertheless, in view of the jurat's immediate apposition to the affidavit in support of the motion for appointment of counsel and not to the verification itself, we will proceed to resolve the jurisdictional issue, whether the affidavit in itself is a sufficient verification of the original post-conviction habeas corpus petition within the requirements of 14 M.R.S.A. § 5503, which mandates that

"[f]acts within the personal knowledge of the petitioner and the authenticity of all documents and exhibits included in or attached to the petition must be sworn to affirmatively as true and correct."

We note that Rule 35(b)(3) was intended to implement the statute by providing:

"The verification to a petition for writ of habeas corpus shall be subscribed and either sworn to or affirmed by the petitioner; shall reflect that the petitioner has read the petition, or that he is unable to read the English language, that the petition and verification have been read to him, and that he understands the same; and that all matters therein within his personal knowledge are true."

It is clear that the affidavit, properly subscribed and sworn to, bearing the same date as the habeas corpus petition, was making reference to the petition itself and not to the motion for appointment of counsel insofar as Shorette's statements therein to the following effect are concerned:

"1. I am the Petitioner in the above titled action.

\* \* \* \* \* \*

"3. I have read and know the contents of the petition and believe the same to be true."

The question really is, whether, in the circumstances of the instant case, the statement made under oath by Shorette that "I have read and know the contents of the petition and believe the same to be true" is to swear affirmatively to the truth and correctness of facts within the personal knowledge of the affiant as required by 14 M.R.S.A. § 5503. We answer in the affirmative.

Initially, we concede that the sworn-to-affirmatively aspect of the verification of all matters within the personal knowledge of the affiant as mandated by 14 M.R.S.A. § 5503 and by Rule 35(b)(3), M.R. Crim.P. is jurisdictional and the Superior Court cannot entertain a petition for post-conviction habeas corpus relief which does not comply with such requirements. *Higgins v. Robbins,* Me., 265 A.2d 90 (1970); *Holbrook v. State,* 161 Me. 102, 208 A.2d 313 (1965).

Affidavits that pleadings or facts are true according to the best knowledge and belief of the affiant have been held fatally

defective. *Fogg v. Fogg*, 31 Me. 302 (1850); *Englebrecht v. Development Corporation for Evergreen Valley*, Me., 361 A.2d 908 (1976). See also *Donna v. City of Auburn*, 148 Me. 356, 93 A.2d 484 (1952).

█ In this case, it is obvious beyond doubt that the facts asserted by the affiant in his petition for post conviction habeas corpus relief were all within his personal knowledge. They have reference to matters in which he participated personally or to events at which certain facts occurred or failed to take place while he was an active participant therein. Shorette's oath that he "believed the same to be true", if wilfully and corruptly false, would subject him to the penalties of perjury or false swearing under 17–A M.R.S.A., §§ 451 and 452. As pointed out in 70 C.J.S. Perjury § 5, at page 462, in order to constitute perjury or false swearing, the false statement must be one of fact, and not of opinion or belief; an honest but erroneous expression of opinion or belief will not support a charge of perjury or false swearing. However, the existence or nonexistence of an opinion or belief is, in itself, a matter of fact, and, if material, the false statement of opinion or belief may constitute such offense. See also 41 Am.Jur., Perjury, § 6, p. 6; *Shook & Fletcher Supply Company v. City of Nashville*, 47 Tenn.App. 339, 338 S.W.2d 237 (1960); *State v. Sullivan*, 24 N.J. 18, 130 A.2d 610, 66 A.L.R.2d 761, cert. denied, 355 U.S. 840, 78 S.Ct. 52, 2 L.Ed.2d 51 (1957); *People v. Dixon*, 99 Cal.App.2d 94, 96, 221 P.2d 198, 199 (1950).

█ The underlying purpose of the statutory requirement that the facts within the personal knowledge of a post-conviction habeas corpus petitioner must be sworn to affirmatively as true and correct is to insure the good faith of the petitioner in presenting non-frivolous claims, and, in relation to serious ones, to identify the issues, confine the evidence thereto and simplify the trial of the case, all in the interest of promoting judicial economy.

The instant affidavit-verification, wherein Shorette stated under oath that he *believed* the factual allegations of his petition, which were all within his personal knowledge, to be true, was in substantial compliance with the requirements of 14 M.R.S.A. § 5503 and Rule 35(b)(3), M.R.Crim.P.

We note the dual structure embodied in the model verification form (form 26) of the Appendix of Forms.[2] Even though the statute itself did not detail the specific contents of the verification, the drafters of the rules of criminal procedure visualized that petitions under the statute might contain two types of allegations: (1) those of facts which are within the petitioner's personal knowledge and (2) those of facts which he only knows from information imparted to him and which he believes to be true. The model form, in consistent implementation of the statute and rule, does provide a fitting verification for cases in which the petition partakes of both kinds of factual allegations. But where all the facts of the petition are obviously within the personal knowledge of the petitioner or are so stated to be, there is no need to use the exception clause—"except such matters as are alleged on information and belief, and as to those matters he alleges that he believes them to be true."

█The use of the expression that he "believed" the factual allegations of the petition to be true did not fatally depart in this case from the essential requirements of the statutory verification requirement.

2. FORM 26. VERIFICATION TO PETITION (RULE 35)

STATE OF MAINE

_____, ss

_____ being first duly sworn deposes (affirms) and says:

He is the petitioner named in the foregoing petition; that he has read the same; that all matters set forth therein are true, except such matters as are alleged on information and belief, and as to those matters he alleges that he believes them to be true.

[s] _____

Subscribed and sworn to (affirmed) before me this _____ day of _____, 19____.

[s] _____

[Office of person authorized to administer oaths]

"The word 'belief' is equally appropriate to describe a state of mind which regards the existence of a fact as certain and a state of mind which thinks that the fact exists but recognizes a varying degree of chance that it may not exist." Restatement of the Law of Torts, sec. 289d.

The word "believe" may be used, as it was in this case where all the facts alleged in the petition were within the personal knowledge of Shorette, as an affirmation of these factual allegations. See *Hatch v. Carpenter,* 75 Mass. (9 Gray) 271 (1857); *State v. Berkeley,* 41 W.Va. 455, 23 S.E. 608 (1895).

 Finally, the affidavit-verification was not in violation of the statutory requirement that the facts within the personal knowledge of the petitioner must be sworn to *affirmatively* as true and correct. It is said that the presumption of truth is in favor of the person who swears affirmatively. The statute undoubtedly was intended to require that facts stated to be within the personal knowledge of the affiant be based upon affirmative evidence, rather than upon negative evidence pointing to the existence or nonexistence of a fact. Here, it is obvious that Shorette's oath to the factual allegations of his petition was founded upon an affirmative basis, to wit, his own perception through his senses of the actual facts that he said took place. The statute requires no more. See *Anderson v. Horlick's Malted Milk Co.,* 137 Wis. 569, 119 N.W. 342 (1909); *Pollard v. Wittman,* 28 Wash.2d 367, 183 P.2d 175 (1947). See also *Northeast Investment Co. Inc. v. Leisure Living Communities, Inc.,* Me., 351 A.2d 845, 854 (1976).

## II

The facts which give rise to the main issue may be summarized as follows:

The petitioners-appellees (Petitioners) were separately indicted on September 8, 1977 for two identical offenses arising out of a single occurrence, armed robbery and terrorizing with a firearm in violation respectively of 17–A M.R.S.A. §§ 651 and 210. On the day of trial, October 25, 1977, both agreed to change their previously entered pleas on the terrorizing charges from "not guilty" to "guilty" as the result of a plea agreement negotiated by their attorney and the prosecutor. The agreement called for the dismissal of the armed robbery charges by the prosecutor and his recommendation to the court that each petitioner receive a two-year sentence in the terrorizing case.

After complying fully with the requirements of Rule 11(a), M.R.Crim.P.[3] and being made aware of the particulars of the negotiated plea agreement, the trial Justice addressed the petitioners in turn as follows:

[The Court]

"Q. Mr. York, do you understand the recommendation and agreement outlined by counsel is not binding in any way upon the Court?

"A. Yes.

"Q. In other words, notwithstanding that agreement which, as I told you, is not binding, the Court can sentence you to anything up to the maximum of years, namely ten years.

"A. Yes.

"Q. Recognizing that, do you wish to withdraw your plea or to continue with your plea of guilty?

"A. To continue."

\* \* \* \* \* \*

[The Court]

"Q. Mr. Shorette, I want you to understand that that agreement is not binding upon the Court, notwithstanding whatever counsel may say,

---

3. Rule 11(a), M.R.Crim.P. provides in pertinent part that

"[t]he court may refuse to accept a plea of guilty, and shall not accept such plea or a plea of nolo contendere except when the offense charged is a Class D or Class E crime, without first (a) making such inquiry as may satisfy it that the defendant in fact committed the crime charged, and, (b) addressing the defendant personally and determining that the plea is made voluntarily with understanding of the nature of the charge."

the Court is still free to impose anything up to the maximum sentence in this matter. Do you understand that?

"A. Yes.

"Q. At this time, I would offer you the opportunity to withdraw your plea of guilty and you can do that and plead not guilty if you wish to. Do you wish to withdraw your plea?

"A. No, sir."

Following a finding in each case that the plea of guilty to the charge of terrorizing with a firearm was knowingly, understandingly and voluntarily made, the trial Justice indicated that he was accepting the plea of guilty, but would not be sentencing at that time. Without any affirmatively stated acceptance or rejection of the negotiated plea agreement, the Justice then, in his colloquy with York in the presence of Shorette, said:

"I would ask that a pre-sentence investigation be done by the Probation and Parole Department. They will contact you and the nature of this investigation is to get as much background information on you as possible to assist the Court in deciding what the appropriate sentence is. So you should be cooperative with them in that regard."[4]

On November 4, 1977, the presiding Justice, after ascertaining from York that the pre-sentence investigation report was essentially accurate, proceeded to sentence him, again without an affirmatively stated acceptance or rejection of the negotiated plea agreement, to a sentence greater than the negotiated State recommendation. In the companion case, after being informed by Shorette that he did not care to say anything before the Court imposed sentence, the Justice proceeded to impose a three-year sentence as he had done with York.

We note that the present issue was not raised with the trial Court by either of the petitioners at the time of sentence, but the habeas corpus Justice found as a fact that trial counsel had been asked by the petitioners the reason for the three-year sentence and that he had informed his clients the sentence was "only one year more" and should be accepted.

In this post-conviction proceeding, the single Justice found as a fact that both York and Shorette, from October 25, 1977, when their guilty pleas were accepted by the Court after a finding of voluntariness, until they were actually sentenced on November 4, 1977, entertained an "honest and well-founded" belief that their sentences would not exceed the recommended two years upon which their attorney and the prosecutor had agreed in their negotiations for the entry of a plea of guilty.

The single Justice further found as a fact that the trial Justice had not complied with the requirements of Rule 11(b) respecting negotiated pleas in that he failed to inform the petitioners either at the time of accepting the guilty pleas or prior to passing sentence that he was rejecting the recommended two-year sentences, nor did he afford them the opportunity to withdraw their guilty plea as provided by the Rule.

Under these circumstances, the single Justice stated "the ultimate conclusion must be reached that the pleas became involuntary."

While it is unclear to what extent the single Justice's ultimate conclusion of involuntariness of the petitioners' guilty pleas rested upon their "honest and well-founded" belief that the ensuing sentence would not exceed two years, the record clearly shows that the Justice rooted his conclusion of the invalidity of the pleas upon the trial Justice's failure to comply with the requirements of Rule 11(b)(3).

---

4. Rule 11(b)(2) expressly allows the postponement of decision as to the acceptance or rejection of the plea agreement until a pre-sentence investigation is made and the report thereon is available:

"Notice of Such Agreement. If a plea agreement has been reached by the parties, the court shall, on the record, require the disclosure of the agreement in open court at the time the plea is offered. Thereupon the court may accept or reject the agreement, or may defer its decision as to the acceptance or rejection until there has been an opportunity to consider the pre-sentence report."

The correctness of his ruling must depend upon the proper interpretation of Rule 11(b) relating to negotiated pleas.

Initially, we may state that the rule was promulgated to meet a near-absolute need in the criminal justice system and has proven a highly desirable adjunct to the process. As stated in *Santobello v. New York,* 404 U.S. 257, at 261, 92 S.Ct. 495, at 498, 30 L.Ed.2d 427, at 432 (1971):

> "It [plea bargaining] leads to prompt and largely final disposition of most criminal cases; it avoids much of the corrosive impact of enforced idleness during pretrial confinement for those who are denied release pending trial; it protects the public from those accused persons who are prone to continue criminal conduct even while on pretrial release; and, by shortening the time between charge and disposition, it enhances whatever may be the rehabilitative prospects of the guilty when they are ultimately imprisoned."

Properly administered, plea bargaining can benefit all concerned:

> "The defendant avoids extended pretrial incarceration and the anxieties and uncertainties of a trial; he gains a speedy disposition of his case, the chance to acknowledge his guilt, and a prompt start in realizing whatever potential there may be for rehabilitation. Judges and prosecutors conserve vital and scarce resources. The public is protected from the risks posed by those charged with criminal offenses who are at large on bail while awaiting completion of criminal proceedings." *Blackledge v. Allison,* 431 U.S. 63, 71, 97 S.Ct. 1621, 1627, 52 L.Ed.2d 136, 145 (1977).

But, the interplay between the agreement securing a negotiated plea between an accused and the prosecutor, on the one hand, and the adjudication by the court, on the other, respecting the voluntary and knowing aspect of that plea, must be attended by such safeguards that the due process rights of the accused may not be denied. Rule 11(b) was intended to provide such safety measures.

Essential to such a practice which requires court adjudication that the negotiated guilty plea be entered into by the accused voluntarily, knowingly and understandingly is the duty of the court, if it does not intend to accept the bargain, to inform the parties, including the defendant, in an unequivocal way that the court is rejecting the plea agreement and that the defendant may withdraw his plea. Rule 11(b)(3) so provides.

The first paragraph of Rule 11(b) deals exclusively with the scope of the powers given the parties in plea bargaining. It does emphasize, in the case of B-type agreements, consisting of mere recommendations for a particular sentence or a prosecutorial promise not to oppose the defendant's request for such a particular sentence as opposed to a positive agreement to dismiss other charges (A-type) or that a specific sentence *is* the appropriate disposition of the case (C-type), that such recommended sentences "shall not be binding upon the court."

Rule 11. (b) Negotiated Pleas.

> "(1) The attorney for the state and the attorney for the defendant or the defendant when acting pro se may engage in discussions with a view toward reaching an agreement that, upon the entering of a plea of guilty or nolo contendere to a charged offense or to a lesser or related offense, the attorney for the state will: (A) dismiss other charges; (B) make a recommendation or agree not to oppose the defendant's request, for a particular sentence, with the understanding that such recommendation or request shall not be binding upon the court; (C) agree that a specific sentence is the appropriate disposition of the case."

The second paragraph of the rule mandates recording of the plea agreement upon the court and determines the time for taking action thereon, whether at the time of the taking of the guilty plea or later, if a presentence report is then unavailable.

Rule 11. (b) Negotiated Pleas

> "(2) Notice of Such Agreement. If a plea agreement has been reached by the

parties, the court shall, on the record, require the disclosure of the agreement in open court at the time the plea is offered. Thereupon the court may accept or reject the agreement, or may defer its decision as to the acceptance or rejection until there has been an opportunity to consider the presentence report."

The third paragraph of the rule is the only section which delineates the duties of the court in relation to the acceptance or rejection of the plea agreement.

Rule 11. (b) Negotiated Pleas

"(3) Acceptance or Rejection of Plea Agreement. If the court accepts the plea agreement, the court shall not embody in the judgment and sentence any disposition less favorable to the defendant than that provided for in the plea agreement. *If the court rejects the plea agreement, the court shall on the record inform the parties of this fact,* advise the defendant personally in open court that the court is not bound by the plea agreement, afford the defendant the opportunity to then withdraw his plea and advise the defendant that if he does not withdraw his guilty plea or plea of nolo contendere the disposition of the case may be less favorable to the defendant than that contemplated by the plea agreement." (Emphasis supplied)

The first paragraph of the rule which ties the "understanding clause" directly to B-type agreements instead of having the same apply to all three types of agreement has generated some confusion.

Some federal courts, in interpreting the parallel federal rule 11, have excluded B-type agreements from the mandatory strictures surrounding non-acceptance or rejection of the negotiated plea under the rule.

The rationale for such interpretation may be stated as follows:

"No agreement, whether of type A, B or C, is binding on the court. It may approve or reject any of these agreements. This being so, the Congress

would have had no reason to use the critical language for the type B agreement unless it meant that the *agreement* could be both approved and satisfied even though the *recommendation* or *request* failed to persuade the court to impose the very sentence recommended or requested." (Emphasis in original) *United States v. Sarubbi,* 416 F.Supp. 633, 636 (D.N.J.1976).

Accord: *United States v. Savage,* 561 F.2d 554 (4th Cir. 1977); *United States v. Henderson,* 565 F.2d 1119 (9th Cir. 1977).

But the Sixth Circuit in *United States v. White,* 583 F.2d 819 (6th Cir. 1978) has repudiated such interpretation.

"[W]here the parties have entered into a (1)(B) plea agreement, the court does not accept the agreement within the meaning of paragraph (3) when it allows the parties to make a sentencing recommendation or request but imposes a different, more severe sentence. If the court rejects the sentencing recommendation it must comply with the requirements of paragraph (4) and inform the defendant that the court is not bound by the plea agreement, afford the defendant an opportunity to withdraw his guilty plea, and inform him that if he persists in his plea of guilty, the disposition of the case may be less favorable to him than that contemplated by the plea agreement." [5]

Accord: *People v. Wright,* 573 P.2d 551 (Colo.1978); *Schellert v. State,* 569 S.W.2d 735 (Mo.1978); *State v. Goodrich,* 116 N.H. 477, 363 A.2d 425 (1976). See also *McCormick v. State,* 38 Md.App. 442, 381 A.2d 694 (1978); *Commonwealth v. Sutherland,* 234 Pa.Super. 520, 340 A.2d 582 (1975); *State v. Fisher,* 223 N.W.2d 243 (Iowa 1974); *State v. Loyd,* 291 Minn. 528, 190 N.W.2d 123 (1971). Contra: *People v. Lambrechts,* 41 Ill.App.3d 729, 355 N.E.2d 53 (1976); *State v. Ramos,* 85 N.M. 438, 512 P.2d 1274 (1973).

This very point gave rise to the error at the trial level in this case. Upon learning at the plea-taking hearing that the parties

---

**5.** Paragraphs (3) and (4) of Federal Criminal Rule 11(e) correspond to the first and second sentences, respectively, of Maine Criminal Rule 11(b)(3).

had entered into an agreement whereby in consideration of the petitioners' plea of guilty to the charge of terrorizing with a firearm the prosecutor promised to dismiss the armed robbery indictment and to recommend the minimum sentence of two years, the trial Justice informed the petitioners respectively that the negotiated agreement was not binding in any way upon the court and that the maximum sentence of ten years could be imposed. He further advised them that, in view of this fact, they could right then and there withdraw their guilty plea. Although he indicated to them at that time that the prosecutorial recommendation was not binding on the court, he never did tell them that he was rejecting the negotiated recommended sentence. In continuing the case for sentence pending a pre-sentence investigation and report, the Justice was necessarily deferring his decision as to the acceptance or rejection of the State's recommendation of sentence until he had the opportunity to decide in light of such report whether the recommended sentence was the appropriate one under the circumstances and as a result thereof whether to accept or reject the negotiated agreement. The petitioners had reason to believe that the acceptance or rejection of the plea agreement would depend upon the results of the pre-sentence investigation. When at the continued hearing the Justice proceeded to sentence without informing the petitioners that he was then rejecting the State's recommended two-year sentence and did not afford them at that time another opportunity to withdraw their plea of guilty, he was closing shut the trap in which the petitioners had been invited to enter at the plea-taking proceeding.

"To say in these circumstances that all which was bargained for and agreed to was fulfilled by the prosecutor's mere act of recommending probation would reduce the bargain to a trap, or, at best, a formality." *Thomas v. State,* 327 So.2d 63, at 64 (Fla.App.1976).

The New Jersey Court expressed the same concern about the procedures surrounding negotiated plea agreements, when it said in *State v. Thomas,* 61 N.J. 314, 294 A.2d 57 (1972):

"It is apparent that these procedures have as one of their purposes to assure a defendant that in entering into a plea bargain he will not thereby become entrapped. It is equally as important to assure a defendant that after the agreement has received final judicial sanction, it will be carried out according to its terms. Only if it is generally believed that performance on the part of the State will not disappoint a defendant's reasonable expectations will plea bargaining become and remain a truly effective device in criminal administration. Aside from this pragmatic necessity, essential fairness dictates the same result."

■ We are aware that our Rule 11(b) is closely patterned after the counterpart federal rule dealing with negotiated pleas and that it has been the practice of this Court to examine and analyze the decisions of the federal courts under the federal rules in interpreting our own rules. Although we are not compelled to read state procedural criminal rules adopted from previously promulgated federal rules in the same way as the federal courts have construed them, such decisions are highly persuasive. *State v. Hamann,* 262 N.W.2d 495 (N.D.1978). And, absent compelling reasons to the contrary or significant differences in content or language, an adjudged federal construction should prevail. See *Rollins Environmental Services, Inc. v. Superior Court,* 368 Mass. 174, 330 N.E.2d 814 (1975).

■ Plea bargaining securing to the State the entry of a plea of guilty or nolo contendere on the part of the accused is a serious and sobering occasion for criminal defendants inasmuch as it effects a waiver of the fundamental rights to a jury trial and all related constitutional privileges in connection therewith. *Santobello v. New York,* 404 U.S. 257, 264, 92 S.Ct. 495, 500, 30 L.Ed.2d 427, 434 (1971) (Douglas, J. concurring).

■ In view of the fact that the plea-bargain process involves the waiver of fun-

damental rights of criminal defendants and that the federal courts are in disagreement respecting the proper interpretation to be given the rule, we resort to our own canon of interpretation which says that criminal rules, as criminal statutes, are to be strictly construed in favor of criminal defendants, especially where substantial rights are involved. *Cote v. State,* Me., 286 A.2d 868, 869 (1972); *Tuttle v. State,* 158 Me. 150, 180 A.2d 608, cert. denied, 371 U.S. 879, 83 S.Ct. 151, 9 L.Ed.2d 116 (1962). At the same time, we may add that the Sixth Circuit's approach seems to us a better format within which the necessary fundamental safeguards that should surround the plea-bargaining process may be guaranteed.

■ Hence, we hold, pursuant to the requirements of Rule 11(b)(3), that, if a plea agreement of the B-type has been reached by the parties and disclosed to the court on the record, the sentencing justice may not embody in the judgment and sentence a disposition less favorable to the defendant than that provided for in the plea agreement, unless he first informs the parties, including the defendant, *unequivocally,* in the language of the rule or in equivalent terms, that he is rejecting the plea agreement, and further advises the defendant personally in open court that the court will not be bound by the plea agreement, and that he is now affording the defendant the opportunity to withdraw his plea, and lastly, in addition thereto, warns the defendant that if he does not withdraw his guilty plea (or plea of nolo contendere) the disposition of the case may be less favorable to the defendant than that contemplated by the plea agreement.

■ We realize that the writ of habeas corpus ordinarily will not lie to correct trial irregularities which could have been raised on appeal. A post-conviction habeas corpus petition may not be used as a substitute for appeal. *Mottram v. State,* Me., 263 A.2d 715, 725 (1970); *Papolas v. State,* Me., 235 A.2d 533 (1967); *Bennett v. State,* 161 Me. 489, 214 A.2d 667 (1965).

Whatever may have been the practice under the original Rule 32(d) of the Maine Rules of Criminal Procedure which permitted a defendant, after entry of a plea of guilty and after sentence, to move to withdraw the plea in order to correct manifest injustice, since the amendment of March 1, 1971,[6] there is a question whether such a motion was available to the petitioners at trial to lay the basis for an appeal if denied, the petitioners having already been sentenced when they first found out that their negotiated plea recommendation had been rejected without prior compliance with Rule 11(b)(3), even though they were not then in execution of sentence. The sole remedy, at least after sentence has been entered upon, is now by petition for statutory post-conviction relief. *State v. Grondin,* Me., 284 A.2d 677 (1971), at footnote 1 on page 678.

In the Advisory Committee Notes to the stated amendment to Rule 32(d), Glassman, Maine Practice, Rules of Criminal Procedure Annotated (1974 Pocket Part) at page 52, we read:

> "Since it was the belief of the Committee that the existence of this alternative remedy when Maine has a comprehensive post-conviction relief procedure is not only unwise but likely to lead to confusion and complications, Rule 32(d) is amended."

The issue of waiver or res adjudicata by reason of the petitioners' failure to object at the trial level or to raise the point on direct appeal was not brought up in the instant proceedings for habeas corpus relief; nevertheless, we did dispose of the underlying question concerning the applicability of Rule 11(b), M.R.Crim.P. In so doing, we took into consideration the fact that this Court had not heretofore settled the issue, whether Rule 11(b)(3) applied to B-type negotiated pleas. Furthermore, the petitioners have demonstrated that manifest injustice would otherwise result. We

---

**6.** Rule 32(d) amended effective March 1, 1971:
"A motion to withdraw a plea of guilty or of nolo contendere may be made only before sen-

tence is imposed or imposition of sentence is suspended."

intimate no opinion, however, respecting the availability of a motion to withdraw a plea of guilty after sentence but prior to execution thereon and the possibility of appellate review on direct appeal, if the motion be denied, even in a manifest error-serious injustice context.[7]

The decision of the single Justice was correct and the entry will be

State's appeals denied.

Judgments affirmed.

WERNICK and ARCHIBALD, JJ., did not sit.

---

**7.** We are aware of the recent decision of the United States Supreme Court in *United States v. Timmreck,* —— U.S. ——, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979), where a *formal* violation of Rule 11 was considered insufficient to support a collateral attack on a conviction based on a guilty plea. *Timmreck* is distinguishable from the instant case. In *Timmreck* the plea agreement between the prosecutor and the defendant involved solely an A-type agreement pursuant to which all other charges against the defendant would be dismissed by the prosecutor and they were. The Court left open the question whether § 2255 post conviction relief would be available if a violation of Rule 11 occurred in the context of aggravating circumstances, such as in the instant case, where the violation deprived the defendants of "the rudimentary demands of fair procedure."